Good morning, Your Honor. Good morning. My name is Jeff Friedman, and I represent plaintiffs in this matter, and I would ask respectfully to reserve five minutes for rebuttal. Yes, you have to keep your own time, but I'll try to remind you. Thank you, Your Honor. The district court erred in two main ways here in granting summary judgment for defendants in this antitrust case. First, the district court erred in finding that plaintiff's evidence of antitrust injury was insufficient in order to allow a reasonable juror to find in plaintiff's favor. The second error, which was interrelated with the first, was the district court's finding, or I should say lack of any finding, with respect to plaintiff's 56F affidavit that it filed at the same time it opposed defendant's summary judgment motion. A brief procedural context will help frame these issues. The district court had not set a merits fact discovery cutoff point at the time defendant moved for summary judgment. In fact, the district court specifically was attempting to target class certification. It had set a fact discovery cutoff for class certification. That came and went, and we had moved, plaintiffs had moved, to compel significant volume of transactional data. And the justification for the volume of transactional data was specifically in order to respond to the anticipated attacks at class certification on plaintiff's proposed models to demonstrate antitrust injury, as well as potential attacks defendants would make with respect to market definition. When was the 56F declaration filed? It was filed on the same date that we opposed class certification. I'm looking for a date, counsel, not an argument. The 56F was filed, Your Honor, October 6, 2009. And when was summary judgment entered? Summary judgment was entered in, I believe it was, the ruling, I believe, was in March of 2010. Now, in the 56F affidavit, you told the court that there were items that you had requested from eBay that you hadn't received. Is that true? True. Okay. Now, sometime after that, you received some documents in response to your discovery request, correct? We received transactional data, I believe, in February, Your Honor, prior to the ruling on the motion for summary judgment. And upon receipt of the information, did you feel it was complete? No, Your Honor. We actually had further requests outstanding. Did you advise the district court of either the receipt of the information or your belief that it was inadequate? We started to meet and confer, no, Your Honor, to answer your question. Why not? Well, we were awaiting ruling at that time, Your Honor. We had already asked... The ruling on what? On the motion for summary judgment. And you didn't think that it was relevant to the summary judgment decision? Well, we had already told the court in the 56F application that the information was relevant. But you got the relevant information? Yes, Your Honor. You didn't think that the court should know before it ruled that you had that information and what its effect was? Well, the answer is the effect, Your Honor, would have been to have to then go and pop... This is transactional data. This isn't just documents. This is many, many bytes of data that then would have to have been populated into the regression model to then respond to the arguments. Did you tell the district court that? We told the district court that, absolutely, Your Honor, in both our motions to compel, which were granted. They were granted. So we moved to compel. No, no, no. After you get the documentation, what you're saying now is, as I understand it, is a couple of things. One is, it was not complete, in your opinion. Correct. You didn't tell the court about that? Correct. In fact, did you even tell the court that you had received any documentation? We did not, Your Honor. Okay. And your third statement, and correct me if I'm wrong, is that it was very detailed information, and it needed to be populated into the economic theorems you had previously put before the court. Correct. Did you tell the court that? No, Your Honor. And, in fact, on October 22nd, did you tell the court, and I'm quoting here, plaintiffs are confident that the court has all the evidence and argument it needs to conduct a rigorous analysis of the issues? For class certification, yes, Your Honor. For class certification. Okay. So, with respect to – I take the court's questions in terms of – This was – the response I just referred to is when eBay requested a delay in the summary judgment hearing, right? You objected to that. We did, Your Honor. And you said, no, don't delay it. We're ready to go right now. The court has all the evidence and information it needs. Well, we had asked for a – no, Your Honor. We asked for a longer delay. We asked to vacate the summary judgment hearing date because of the absence of having received the data. The court, instead of vacating it, gave us, I think, either a two- or three-week extension of time and said it was not going to extend it beyond that. eBay had already said that the production of data would take them six months to do. And, therefore, the two-week extension that the court – two- or three-week extension that the court gave did nothing in terms of addressing the data. eBay wanted an extension simply to move the time so it could have a full-blown evidentiary hearing on class certification and summary judgment, not in respect to being able to provide the data that it was ordered to produce. And I would just highlight one point, Your Honor, and that is, remember, this is data that – they filed their motion for summary judgment while our motion to compel was pending for this very data. That's why you responded with a 56-F. We did. Both first the motion to vacate, Your Honor, and then the 56-F. Three days after – they, in fact, if they waited four days before they filed their summary judgment motion, Judge Seaborg, at the time the magistrate judge, his ruling granting, in part, the production of data, would have already occurred. And so what happened, Your Honor, in this case is they filed that. They then had to appeal to Judge Fogel because they knew they couldn't produce the data in time. They appealed to Judge Fogel. Judge Fogel denied that appeal of Judge Seaborg's order, and in so doing, explicitly recognized, Your Honors, that plaintiffs had made a sufficient showing that that data was important and necessary in order to present its economic models. So the record that was in – it was extant at the time, going into summary judgment, was Judge Fogel recognizing and affirming the need in order to – in order to present our models, the data. In addition, Your Honor, and I would say this, because I understand the court's question, which was why didn't we present the court – give notice of the data. At the hearing, we cite in the record, one of the things that I presented, or at least tried to raise with the district court, was whether there was sufficiency of evidence. And the court cut me off at the time and said, I don't believe it's a sufficiency of evidence issue. I think the issue that you're going to face is approach. So when we left the summary judgment hearing, both in the fact that we had followed the rules of 56F, we had tried repeatedly to stave off the hearing in order to get the data necessary, which was rejected numerous times. And in the face of the explicit affirmance of our request for the data necessary to populate the models, combined with the district court judge's affirmative statement that we – in history, we had sufficient evidence, it was an approach issue. Therefore, at the time, when we got the data, it wasn't, okay, now we need to present to the district court the fact that we just got the data. We would still have to populate the models, do an analysis, and essentially re-argue summary judgment at that time. All in the face of the district court having told us, you should get the data, we find it necessary, and I find that you have sufficient evidence. So I would just like to go as to now in terms of the – I don't quite understand how you say that in that motion, the response to the motion on October 22nd, you objected to the continuance saying that, and it's not just certification, that eBay seeks to move the hearing dates for both the motion for summary judgment and the motion for class certification by complaining the court's calendar that will prejudice eBay. Given the avalanche of evidence and argument in the record already, it is hard to fathom. eBay making this argument with a straight face. Now, they want to postpone the hearing date on summary judgment, and you say that given all of the evidence in the record, it's hard to fathom how they can make that argument. Your Honor, all they were seeking to do was specially set the hearing. It was in the context of them trying to present a battle of the experts. What they were trying to do was call our expert and present their expert and have an evidentiary hearing. They weren't seeking to indefinitely delay in order to be able to get us data that they were representing was going to take them six months to produce to us. They had nothing to do with each other. You know, we're not – this is sort of a wavelength thing. I mean, I have the same questions Judge Reinhart has. As you understand, we don't confer prior to coming to court, but I have the same question, and that is, to me, as someone who spent 25 years doing civil litigation, I do not understand how you can say on the one hand, there's information I need that I don't have to respond to the summary judgment motion on the merits, and when the other side asks to delay the hearing on the summary judgment, you tell the court it has all the information it needs, and when you get some documentation from the other side, you, A, don't tell the court about it, don't tell the court that it's incomplete, and don't tell the court that you need additional time to populate your data. Now, that's the connection that's not being made here, and you're not going to persuade me unless you can connect those two. And I apologize if I am not effectively communicating what – Tell me how we connect those two. Okay. The dots are, Your Honor, we had repeatedly asked the district court to delay the proceedings. Repeatedly. We asked – But in October, you're telling the court not to delay it. Judge, we are not – we are simply saying they were asking for a short delay after we had repeatedly asked it simply to move it to special – This is completely illogical to me. If your position really was we don't need a short delay, we need a big delay, and the reason we need a big delay is that these guys won't give us the information we need to respond to the MSJ. Precisely. You never said that. Yes, we did, Your Honor. Repeatedly. You said given the avalanche of evidence and argument in the record already, it is hard to fathom how big eBay makes this argument with a straight face that they need another month. Your Honor, we – I'm sorry if this isn't clear. We had sought to move the class certification date. He simply moved class certification discovered. We had asked to move it because of the data that we did not have. We moved to compel. We then told – we then, after we got the order, three days after we got the order granting the motion to compel, we asked the court to vacate the summary judgment date. The court – When was that? That was on August 18th, 2009, Your Honor. So this October 22nd filing is after that. Correct, Your Honor. So we asked again to move the date appreciably for the data, and he refused to materially do so. And instead what they argued was what we're essentially asking for is a 56F, which should appropriately be done at the time you file your opposition for a motion to summary judgment. That's what they did to oppose our request to vacate the summary judgment date. So what we did – Well, as a matter of Wright and Miller, that's entirely correct. Agreed, Your Honor. Agreed. But I'm simply saying that that was the second effort we made in front of the district court judge to try and explain we needed the data. We then filed, according to Wright and Miller, our 56F affidavit and laid out exactly why we need it, which was conformed and consistent with both Judge Seaborg's order and Judge Fogle's order. And, Your Honor, to be clear, Judge Fogle didn't deny the 56F application. He didn't rule on it. He didn't look at it and say it's untimely or you haven't made a showing. He didn't do that at all. Or you said you had everything you need. He didn't even rule on the 56F application, Your Honor. I see that I have 16 seconds left, Your Honor. Actually, you're over time. Okay. But that's up to the presiding judge. Well, all right. We'll give you a couple of minutes. Thank you, Your Honor. May it please the Court? Tom Brown on behalf of Defendant Ebay. Do you want to identify for the record your co-counsel? And my co-counsel is Kathy Robeson of O'Melveny & Meyers with me today. What do you say about Judge Fogle's failure to rule on the 56F motion? We addressed this in our opposition brief, Your Honor. The law of this circuit is that a denial, a motion granted for summary judgment with an outstanding 56F motion implicitly denies the 56F motion. And so that's our position, is that Judge Fogle's grant of the- Okay, counsel, then would you say that if it's an implicit denial, but the Court has not given reasons, that we would review that on a de novo rather than abuse of discretion basis? Your Honor, there are cases in this circuit which take the position that with an implicit denial that the standard of review is de novo for 56F. As we point out in our opposition, we find those cases hard to reconcile with the statement that the denial of the motion for summary judgment in the face of a 56F motion is an implicit denial. Regardless, we think that whatever the standard, there's no basis for stalling summary judgment in this case based on the 56F motion for the reasons that were discussed with my opposing counsel. And I'm happy to discuss the 56F issues. I mean, we believe fundamentally that Judge Fogle's decision should be affirmed for three reasons. For three years of litigation, these three people failed to come forward with evidence that they were harmed by the conduct that they challenged, one. Two, in coming forward with an effort to establish injury, which plaintiffs only did in connection with their motion for class certification, plaintiffs aimed at the wrong target. Instead of attempting to establish injury, that they were actually harmed, they focused exclusively on price. That's wrong as a matter of law in this circuit and doesn't fit the particular circumstances associated with this case. And then three, an issue that the court doesn't need to reach should it affirm Judge Fogle's decision below on the decision, on the reason on which summary judgment was granted, is that plaintiffs failed to come forward, or that the district court made an error in allowing the brown shoe factors to define a relevant market or to raise a tribal issue with respect to that market given the absence of direct evidence establishing a tribal issue of fact with respect to that market. So again, we believe there are three grounds on which this panel can affirm the judgment below. On the issue of whether they came forward with any evidence of causal antitrust injury, the issue on which Judge Fogle granted summary judgment, and the axis around which this whole 56-F motion revolved, it is, Judge Fogle got it exactly right, that their effort to build a regression model around take rate is not capable of establishing any harm to these three particular people. In general, as I understand the plaintiff's 56-F position, it's that they needed information from your client, to use their phrase, to populate the data, so that these economic models would make sense and so that they could be laid before the court in response to the motion for summary judgment. That's their position, right? That is their position. In reply, they say two things. First, that with respect to the model that Dr. Warwick came forward with, that he had controlled for all possible variables and would have controlled for the remaining variables had the additional data been presented. That's what they say in this court. There's a significant problem with this, and that is that neither of those claims, which they assert really for the first time in this court, is supported by the record below. There is not a single statement in the 56-F petition or in the expert declaration in which they came forward with the regression model in which Dr. Warwick said that he needed the data to address the particular objections that we had raised to what he had done with take rates. We argued this case for three hours in front of Judge Fogel, and not once, not once, did plaintiffs say, you know, Judge Fogel, that's an issue that we could resolve if we had the data that you have ordered or that Judge Seaborg has ordered the defendants to produce. There is no support in the record for the proposition that the additional data would have enabled them to address the issues. So that's point one. But, but, I mean, even more than that, on appeal this has become a case of dog bites tail. When plaintiffs introduced the concept of a regression model using take rate, we pointed out to them that if you strip take rate of everything other than changes in price, you're just left with changes in price. This is in Professor Topel's declaration in opposition to plaintiffs' motion for class certification. We actually built a chart that then, this is ER 667. So the court's probably familiar with the famous chart of Napoleon's march into Russia and the declining army and then beating a hasty retreat. So we attempted to build a chart of changes in price and challenged conduct. And it's at ER 667. And in response to that, so this is a direct analysis of that which plaintiffs now claim they wanted all the data all along for. That is to go from take rate to a direct price index. So what's the ER site? 667. In which volume is it? It is in volume 4. The SCRs? Yes. Plaintiff appellant's excerpts of record volume 4. Okay. Okay. So if we're looking directly at price, right, what we see is that prices don't change much. When they change, they change in both directions, up and down, and not at all in connection with the challenged conduct. Their response to this was, and this can be found in, and I apologize, there's a lot of documents in the record. This is a different ER site. This is paragraph 45 of Professor Warwick's reply on class certification. This is ER 89. Though they also make this point at page 13 of their reply. They're not actually interested in looking at movements in eBay's actual prices. What they are attempting to do is to compare eBay's actual prices with but-for prices. Okay. And they don't want to do a before and after comparison of price, conduct, price after conduct to render that comparison. And all of this conversation around what data is outstanding in the effort to strip take rate back down to a price index is an effort to do exactly what is represented on page 667, and they said they didn't want to do. So with the court's permission, unless there are more questions about this issue, I'd like to move away from the spinning dog and talk about the appropriate standard for injury in an antitrust case under section 4 of the Clayton. We believe that the answer to this question is self-evident, that somebody who is suing under a statute that says injury to business or property by reason of an antitrust violation has to establish that they have been made net worse off by the challenged conduct. Indeed, this is a principle of law that is well established in this circuit, one of my favorite Ninth Circuit antitrust decisions is the, I think, not suitably famous but very important Chicken Delight v. Siegel case in which this principle of law is established. It's reaffirmed and rearticulated in L.A. Memorial Coliseum v. NFL in which this court explicitly holds the plaintiff's gross recovery for an antitrust violation must be reduced by any benefit the plaintiff would not have received had there been no anticompetitive conduct by the defendant. This is not an arguable proposition of law. Indeed, it's not a proposition that's even unique to antitrust cases. In upholding the constitutionality of IOLTA programs, following an en banc decision to the same effect from this court, in addressing the plaintiff's argument there that the res generated by the combined sum was taken from them and just compensation was owed, the Supreme Court in Brown v. Legal Foundation of Washington specifically quoted Justice Holmes for the proposition that in a just compensation case the question is not what the owner has lost, I mean, is what the owner has lost not what the government has gained. That is precisely the proposition that we are asserting is established and applies with respect to antitrust cases in the Ninth Circuit under Section 4 of the Clayton Act. Their model completely ignores, completely ignores the delivery of benefits from the conduct that they count. And those benefits are well documented. I'm happy to go into them if the court has any questions about them. And then with respect to the market definition issue, our argument is narrow and I think reasonably straightforward. The district court concluded, we believe appropriately so, that plaintiffs have failed to come forward with evidence establishing a direct evidence that there exists a market unique to online options. And then, based on what the district court describes as the brown shoe factors, concludes that there is a sufficient circumstantial evidence to suggest the existence of such a market. We believe this is clear error under Thurman Industries. The brown shoe factors are only useful when they reveal something about the presence or absence of competition. They have to be economically significant. The decision below offers no explanation as to what the various factors believe. It simply states the conclusion. And in doing so, it turns brown shoe, and this is a point that we observe in our opposition, completely on its head. If we go back to what brown shoe involved, it was an effort on the part of a party that was attempting to merge to argue that there was a clear and distinct difference in market between shoes that were less than $8.99 and more than $8.99. And the Supreme Court concluded that the defendant had failed to establish that that distinction was significant. And on that basis, but then articulated the brown shoe factors and said that in some cases it may be possible to identify relevant submarkets. But those factors are only useful when they reveal something economically significant about how people behave. And here the record is quite clear that what drives seller behavior is the desire to dispose of items. And that is not a decision that is unique with respect to the format of the particular option. I have a particular sales format. I have additional time. I'm happy to answer any additional questions that the court may have. I have no questions. Thanks. No questions. Thank you, Your Honor. Yes, I said I think we'd give you two minutes, wasn't it? You guys said that? Yes, Your Honor. Thank you. So, first I want to cite to the record that Dr. Work did in his report say that he needed additional data, and that is ER site 81. That's first. Second, setting aside the 56F argument, we believe that the record is sufficient to meet the summary judgment standard with respect to Dr. Warwick's take rate model. And I only have two minutes, and I only want to say this with respect to the model, Your Honor. We submitted our briefs, and I submitted to you the charts from our briefs. Basically, Judge Vogel said it doesn't appear that the take rate model measures overcharge. It does. Overcharge is the classic measure of when there's potentially super competitive pricing. Were the consumers overcharged? And what he did was he created a regression model that measured precisely what the take rate is, which is the effective tax, Your Honors. What does eBay take from the consumers? Let's assume it takes 10% from the consumers. $100 million of buying and selling occurs. It charges, and it only charges fees. It comes from the fee schedules. It charges an effective rate and gets $10 million in revenue from the $100 million. It has a 10% tax on those gross volume of sales. It gets $10 million. What Dr. Warwick did was it did the as-is world as one should in a regression model, and he used to control for variables, independent variables, and then the dependent variable was the take rate. And what he was able to show, and he linked it specifically, was that when there was an alleged anti-competitive act, if you took that anti-competitive act out, what was the impact in the but-for world, but for the acquisition of PayPal? Would the take rate have been higher, lower, or the same? And what he found is right at the point of acquisition, the take rate would have been lower. It's not as if he treats the fees, the fact that the fees need to go up and down, that's irrelevant. As the court knows in the antitrust case, the question can also be whether or not the defendant has maintained, at an artificial level, prices. It doesn't have to be that it raised prices. It's that they are at an artificially high level, and that's what the take rate model showed. Are you going to have to wind this up? Yes, Your Honor. We also briefed extensively the overcharge versus loss of profit. I actually don't think that's a debatable point. But finally, on the point with respect to market definition, we had both economic analysis as well as a branch of factors. We were able to take what they were willing to give to us. They produced transactional data when it suited their experts for their models. They didn't do a regression analysis. They just didn't experiment. They produced transactional data selected by them, not giving us what we needed, to respond to their criticisms. That's the other point, Your Honor, I just want to highlight. The data was to respond. I apologize. I have over three minutes. Thank you. Thank you, Cassidy. The case just argued will be submitted. The court will stand in recess for the day. All rise. The court will stand in recess. The court will stand in recess.
judges: Reinhardt, Hawkins, Gould